**OFFICE OF THE COUNTY COUNSEL**
**County of Los Angeles**
Mary Wickham, County Counsel (SBN 145664)
Scott Kuhn, Assistant County Counsel (SBN 190517)
Andrea Ross, Principal County Counsel (SBN 179398)
Tracy Swann, Principal County Counsel (SBN 172899)
tswann@counsel.lacounty.gov
Joseph Mellis, Deputy County Counsel (SBN 287830)
jmellis@counsel.lacounty.gov
648 Kenneth Hahn Hall of Administration
Los Angeles, California 90012-2713
Telephone: (213) 974-1935

**BARON & BUDD, P.C.**
John P. Fiske (SBN 249256)
Fiske@baronbudd.com
11440 W. Bernardo Court, Ste. 265
San Diego, California 92127
Telephone: (858) 251-7424

**BARON & BUDD, P.C.**
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com
3102 Oak Lawn Ave., Ste 1100
Dallas, TX 75219-4283
Telephone: (214) 521-3605

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| COUNTY OF LOS ANGELES, political subdivision of the State of California; LOS ANGELES COUNTY FLOOD CONTROL DISTRICT, a special district, <br><br> Plaintiffs, <br> v. <br><br> MONSANTO COMPANY, SOLUTIA, INC., and PHARMACIA, LLC, and DOES 1 through 100, <br> Defendants. | CASE NO.:  2:19-cv-4694 <br><br> **COMPLAINT FOR DAMAGES** |

HOA.102543427.1                    1

Plaintiffs COUNTY OF LOS ANGELES and LOS ANGELES COUNTY FLOOD CONTROL DISTRICT hereby allege, upon information and belief, as follows:

## I.   INTRODUCTION

1. Polychlorinated biphenyls (or "PCBs") are man-made chemical compounds that have become notorious as global environmental contaminants — found in bays, oceans, rivers, streams, soil, and air.  As a result, PCBs have been pervasively detected in the tissues of countless living organisms on earth, including marine life, animals, birds, plants and trees, and humans.

2. The extent of PCB contamination is of very serious concern because PCBs are known to cause a variety of adverse health effects.  In humans, PCB exposure is associated with cancer as well as serious non-cancer health effects, including effects on the immune system, reproductive system, nervous system, endocrine system and other health effects.  In addition, PCBs destroy populations of fish, birds, and other animal life.

3. Monsanto Company has repeatedly held itself out as the sole manufacturer of PCBs in the United States from 1935 to 1977, and trademarked the name "Aroclor" for certain PCB compounds.  Although Monsanto knew for decades that PCBs were toxic and knew that they were widely contaminating natural resources and living organisms, Monsanto concealed these facts and continued producing PCBs until Congress enacted the Toxic Substances Control Act ("TSCA") of 1976, which banned the manufacture and most uses of PCBs as of January 1, 1979.

4. U.S. EPA (2000b) has classified PCBs as 'probable human carcinogens.' Studies have suggested that PCBs may play a role in inducing breast cancer. Studies have also linked PCBs to increased risk for several other cancers including liver, biliary tract, gall bladder, gastrointestinal tract, pancreas, melanoma, and non-Hodgkin's lymphoma. PCBs may also cause adverse, non-carcinogenic effects, including reproductive effects and developmental effects

(primarily to the nervous system).  PCBs tend to accumulate in the human body in the liver, adipose tissue (fat), skin, and breast milk.  PCBs have also been found in human plasma, follicular fluid, and sperm fluid.  Fetuses may be exposed to PCBs in utero, and babies may be exposed to PCBs during breastfeeding.  According to U.S. EPA (2000b), some human studies have also suggested that PCB exposure may cause adverse effects in children and developing fetuses while other studies have not shown effects. Reported effects include lower IQ scores, low birth weight, and lower behavior assessment scores.

5. PCBs have traveled into many water bodies in Los Angeles County by a variety of ways.  PCBs were used in many industrial and commercial applications such as paint, caulking, transformers, capacitors, coolants, hydraulic fluids, plasticizers, sealants, inks, lubricants, and other uses.  PCBs regularly leach, leak, off-gas, and escape their intended applications, causing runoff during naturally occurring storm and rain events, after being released into the environment.  The runoff originates from multiple sources and industries and enters water bodies in Los Angeles County through stormwater and dry weather runoff.

6. Many watersheds, lakes, rivers, streams, creeks, bays, ports, harbors, and other bodies of water are contaminated with Monsanto's PCBs, which have been detected by Plaintiffs, the State, and the U.S. EPA in water, sediment, and/or fish.

7. The following watersheds are impacted by PCB contamination in Los Angeles County:

   a. Los Angeles River Watershed

   b. San Gabriel River Watershed

   c. Ballona Creek Watershed

   d. Dominguez Channel and Los Angeles Harbor Watershed

COMPLAINT FOR DAMAGES

1    e.  South Santa Monica Bay Watershed

2    f.  North Santa Monica Bay Watershed

3    g.  Santa Clara River Watershed

4   8.  The California Water Resources Control Board has identified the following

5       waterbodies as impaired by PCB contamination in its 303(d) list of impaired

6       waterbodies in Los Angeles County:

7       a.  Peck Road Park Lake

8       b.  Puddingstone Reservoir

9       c.  Marina Del Rey Harbor

10      d.  Castaic Lake

11      e.  Castaic Lagoon

12      f.  Lincoln Park Lake

13      g.  Legg Lake

14      h.  Santa Fe Dam Park Lake

15      i.  Pyramid Lake

16      j.  Echo Park Lake

17      k.  Machado Lake

18      l.  Ballona Creek Estuary

19      m.  Dominguez Channel Estuary

20      n.  Los Angeles Harbor

21      o.  Long Beach Harbor

22      p.  Santa Monica Bay (offshore and various beaches)

23      q.  Los Angeles River Estuary

24      r.  San Gabriel River Estuary

25      s.  Colorado Lagoon

26      t.  Other Water Bodies set forth in the 303(d) list of impaired water bodies

27          issued by the California State Water Resources Control Board.

28  9.  The Los Angeles Regional Water Quality Control Board (LARWQCB) and the

U.S. EPA have adopted several PCB-associated Total Maximum Daily Loads ("TMDLs") in Los Angeles County, which affect the County of Los Angeles and the Los Angeles County Flood Control District, including the following:

    a.  Ballona Creek Estuary Toxic Pollutants TMDL

    b.  Colorado Lagoon Toxic Pollutants TMDL (City of Long Beach)

    c.  Dominguez Channel and Greater Los Angeles and Long Beach Harbor Waters Toxic Pollutants TMDL

    d.  Machado Lake Pesticides and PCBs TMDL (City of Los Angeles)

    e.  Marina del Rey Harbor Toxic Pollutants TMDL

    f.  Los Angeles Area Lakes TMDL – Puddingstone Reservoir

    g.  Los Angeles Area Lakes TMDL – Peck Road Park Lake

    h.  Los Angeles Area Lakes TMDL – Echo Park Lake (City of Los Angeles)

    i.  Santa Monica Bay DDT and PCBs TMDL

10. The regulatory deadlines by which waterbodies with applicable TMDLs and other 303(d)-listed waterbodies must be brought into compliance with water quality standards are aggressive, many shorter than 10 years.

11. A Total Maximum Daily Load, or TMDL, is a calculation of the maximum amount of pollutant that an impaired body of water can receive and still safely meet water quality standards.[1]  The Los Angeles Regional Water Quality Control Board and the California State Water Resources Control Board have identified certain water bodies within Los Angeles County as "impaired" due to the presence of PCBs.  The U.S. EPA has approved that identification.

## II.    PARTIES

12. The COUNTY OF LOS ANGELES ("County") is a political subdivision of the State of California.

---

[1] United States Environmental Protection Agency, www.water.epa.gov/lawsregs/lawsguidance/cwa/tmdl/

13. The LOS ANGELES COUNTY FLOOD CONTROL DISTRICT ("District") is a special district formed by the Los Angeles County Flood Control Act as adopted by the State Legislature in 1915.

14. The District's primary purposes are flood protection and water conservation. The District is also authorized to provide for incidental recreational and educational uses of its facilities.

15. "Plaintiffs" shall refer to the County and the District collectively.

16. The County and District bring this suit pursuant to California Code of Civil Procedure 731, and California Civil Code sections 3479, 3480, 3491, 3493, and 3494 and any other applicable codes or forms of relief available for monetary damages incurred and to be incurred in reducing, removing, and avoiding the presence of PCBs in water bodies in Los Angeles County and infrastructure and other facilities owned and operated by the County and the District.

17. Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in St. Louis, Missouri.

18. Defendant Solutia Inc. ("Solutia") is a Delaware corporation with its headquarters and principal place of business in St. Louis, Missouri.

19. Defendant Pharmacia LLC (formerly known as "Pharmacia Corporation" and successor to the original Monsanto Company) is a Delaware LLC with its principal place of business in Peapack, New Jersey. Pharmacia is now a wholly-owned subsidiary of Pfizer, Inc.

20. The original Monsanto Company ("Old Monsanto") operated an agricultural products business, a pharmaceutical and nutrition business, and a chemical products business. Old Monsanto began manufacturing PCBs in the 1930s and continued to manufacture commercial PCBs until the late 1970s.

/ / /

21. Through a series of transactions beginning in approximately 1997, Old Monsanto's businesses were spun off to form three separate corporations. The

COMPLAINT FOR DAMAGES

corporation now known as Monsanto operates Old Monsanto's agricultural products business. Old Monsanto's chemical products business is now operated by Solutia. Old Monsanto's pharmaceuticals business is now operated by Pharmacia.

22. Solutia was organized by Old Monsanto to own and operate its chemical manufacturing business. Solutia assumed the operations, assets, and liabilities of Old Monsanto's chemicals business.[2]

23. Although Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to the chemicals business, Defendants have entered into agreements to share or apportion liabilities, and/or to indemnify one or more entity, for claims arising from Old Monsanto's chemical business --- including the manufacture and sale of PCBs.[3]

24. In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia and New Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the Chemicals Business.[4]

25. Monsanto represented in its most recent Form 10-K (for the fiscal year ending August 31, 2016), "Monsanto is involved in environmental remediation and legal proceedings to which Monsanto is party in its own name and proceedings

---

[2] See MONSANTO COMPANY'S ANSWER TO THE COMPLAINT AND JURY DEMAND, *Town of Lexington v. Pharmacia Corp., Solutia, Inc., and Monsanto Company*, C.A. No. 12-CV-11645, D. Mass. (October 8, 2013); see also Relationships Among Monsanto Company, Pharmacia Corporation, Pfizer Inc., and Solutia Inc., http://www.monsanto.com/whoweare/pages/monsanto-relationships-pfizer-solutia.aspx (last accessed February 20, 2014).

[3] *See id.*

[4] *See* Monsanto's Form 8-K (March 24, 2008), and Form 10-Q (June 27, 2008), available at http://www.monsanto.com/investors/pages/sec-filings.aspx (last accessed February 20, 2014).

to which its former parent, Pharmacia LLC ("Pharmacia") or its former subsidiary, Solutia, Inc. ("Solutia") is a party but that Monsanto manages and for which Monsanto is responsible pursuant to certain indemnification agreements. In addition, Monsanto has liabilities established for various product claims. With respect to certain of these proceedings, Monsanto has established a reserve for the estimated liabilities." That filing specifies that Monsanto maintains a reserve of $545 million for environmental and litigation liabilities."

26.     Monsanto, Solutia, and Pharmacia are collectively referred to in this Complaint as "Defendants."

## III.     JURISDICTION AND VENUE

27.     This Court has jurisdiction pursuant to 28 U.S.C. §1332 because complete diversity exists between the Plaintiffs and the Defendants. The Plaintiffs are located in California, but no Defendant is a citizen of California. Monsanto is a Delaware corporation with its principal place of business in St. Louis, Missouri. Solutia is a Delaware corporation with its principal place of business in St. Louis, Missouri. Pharmacia is a Delaware limited liability company with its principal place of business in Peapack, New Jersey.

28.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. section 1391(a) because a substantial part of the property that is the subject of the action is situated in this judicial district.

/ / /

/ / /

## IV.     PLAINTIFFS' STANDING

### A. Stormwater Systems, Public Lands, and Land Ownership

COMPLAINT FOR DAMAGES

29. Plaintiffs have property rights in stormwater drainage systems, captured stormwater, and/or many waterbodies in Los Angeles County that are contaminated with Monsanto's PCBs.

30. Plaintiffs' stormwater drainage systems consist of municipal separate storm sewer systems ("MS4") and non-MS4 components. Plaintiffs' operation of its MS4 is subject to a Municipal Separate Storm Sewer System Permit ("MS4 Permit") from the Los Angeles Regional Water Quality Control Board, pursuant to the National Pollutant Discharge Elimination System under the Clean Water Act, which includes conditions and requirements for the reduction and management of PCBs. In addition, the County and District are named as responsible parties in several Total Maximum Daily Loads ("TMDLs") that require Plaintiffs to significantly reduce concentrations of PCBs in designated water bodies or the entry of PCBs into those water bodies.

31. The District encompasses approximately 3,000 square miles, 85 cities and approximately 2.1 million land parcels. The District's jurisdiction and infrastructure include drainage infrastructure within incorporated and unincorporated areas in every watershed, including, without limitation, 14 major flood control dams and reservoirs, 500 miles of open channel, 2,800 miles of underground storm drain, 23 low flow diversions, 162 debris basins, and an estimated 120,000 catch basins. Below is a map of Plaintiffs' jurisdiction.

/ / /

/ / /

HOA.102543427.1

9



32. The District's geographic boundaries include six major watersheds, including Los Angeles River, San Gabriel River, Dominguez Channel & Los Angeles Harbor, South Santa Monica Bay, North Santa Monica Bay, and Santa Clara River Watersheds.

33. The Plaintiffs provide water quality, flood protection, and water conservation services to many millions of people, including access to recreational opportunities at Plaintiffs' facilities.

34. The County owns and operates streets, gutters, sidewalks, curbs, inlets, and other property, which are components of its MS4, which transport and deliver stormwater to the District's stormwater drainage system and to water bodies in Los Angeles County.  In addition, County owns and/or operates some of the

COMPLAINT FOR DAMAGES

water bodies in Los Angeles County, including Marina del Rey, the largest man-made harbor in the country.

35. Los Angeles County is the most populous county in the United States, with more that 10 million inhabitants—a population larger than that of 41 individual states. As the largest non-state level government entity in the United States, it covers over 4,000 square miles including 88 cities and 140 unincorporated areas.

36. Monsanto's PCBs have contaminated and caused injury to County and District property, including stormwater systems, water bodies, sediment, and other property.

37. As a result of Monsanto's PCB presence, the County and District cannot operate its stormwater drainage systems as originally intended and designed and must spend money and resources to prevent Monsanto's PCBs from being transported through the MS4 systems and into water bodies in Los Angeles County.

38. The County and District have incurred and will continue to incur costs to reduce, manage, and remove PCBs from stormwater systems, stormwater, dry weather runoff, and certain water bodies and submerged lands.

39. The County and District also engage in efforts to capture and beneficially use stormwater and dry weather runoff, some of which contain Monsanto's PCBs, to augment existing water supplies.

40. The County's and District's stormwater drainage systems are injured such that the County's and District's systems have been and must be further retrofitted and improved in order to prevent or reduce PCBs in stormwater and dry weather runoff from entering water bodies in Los Angeles County through the MS4. The retrofits and improvements required to prevent PCBs from entering water bodies in Los Angeles County have cost and will continue to cost the County and District large sums of money.

41. The County's and District's stormwater drainage systems include and will include into the future inlets, outfalls, pipes, drains, catch basins, bioswales,

gutters, streets, channels, basins and other infrastructure and systems, which must be retrofitted to accommodate for the presence of Monsanto's PCBs.

42. The retrofits include but are not limited to new infrastructure construction, infrastructure renovation, additional street sweeping, additional filtering, new engineering and design, new source control program development and management, and other additional retrofits to the current system.

43. Retrofits to the County and District stormwater drainage systems are required to prevent further contamination of waterbodies in Los Angeles County by Monsanto's PCBs.

44. The County and District have adopted Watershed Management Programs ("WMPs") and Enhanced Watershed Management Programs ("EWMPs"), the purposes of which are, in part, to identify projects to reduce stormwater and non-stormwater pollution in the waterbodies in Los Angeles County, including pollution due to PCBs. Examples of retrofits and projects identified in WMPs or EWMPs that address Monsanto's PCBs include but are not limited to regional multi-benefit stormwater capture projects at Ladera Park, Hasley Canyon Park, Franklin D. Roosevelt Park and the former Strathern Inert Landfill; and green street projects including but not limited to Garfield Avenue and Olympic Boulevard in East Los Angeles.

45. The County's retrofits include new development of Green Streets, designed to remove, reduce, and manage the presence of Monsanto's PCBs in the County and District stormwater and dry weather runoff while capturing stormwater and dry weather runoff for beneficial uses to augment existing water supplies.

46. The County has partnered with other agencies to create the Green Streets Implementation Plan for the Dominguez Channel watershed and are currently developing a master plan for green street projects throughout the unincorporated County areas.

COMPLAINT FOR DAMAGES

47.   Currently, sediments and fish tissue within certain waterbodies in Los Angeles County exceed the sediment and/or fish tissue numeric targets for total polychlorinated biphenyls ("PCBs") manufactured by Monsanto.  As a result, the County and District have incurred, and will continue to incur, significant costs including, but not limited to: sampling and analysis of fish tissue, biota, stormwater, ambient water, and sediment for PCBs; fish tracking; hydrodynamic and bioaccumulative computer modeling; source control, and treatment and remediation of stormwater and sediment.

48.   For example, the Puddingstone Reservoir is a 240 acre recreational lake owned and operated by Plaintiffs. Lake activities including fishing, swimming, sailing, jet skiing, and wind surfing. Fishing includes trout, catfish, largemouth bass, bluegill, and carp. The Los Angeles County Department of Public Health has issued fish consumption advisories for Puddingstone Reservoir, a 303(d) impaired water body due to PCBs.

49.   As another example, the Los Angeles County Department of Public Health has issued a fish consumption advisory for the lake at Peck Road Water Conservation Park, another 303(d) impaired water body for PCBs.

50.   Monsanto's PCBs have created and will continue to create a public nuisance with respect to Plaintiffs' stormwater drainage system and property within the waterbodies in Los Angeles County, including stormwater and dry weather runoff that flows into impaired bodies of water, and stormwater and dry weather runoff that is captured for beneficial uses to augment existing water supplies, because Monsanto's PCBs have contaminated the water and sediment and other aspects of the County's and the District's stormwater drainage systems.

/ / /

**B. AB 2594 Stormwater resources: use of captured water.**

51.   The Legislature codified the County and District's property interest in stormwater as a usufructuary right.  On August 25, 2016, the California State

Legislature unanimously passed legislation confirming and codifying the use rights of public entities, such as the County and District, in stormwater. Assembly Bill 2594 passed in the Senate on August 22, 2016 by a vote of 38-0. AB 2594 passed in the Assembly on August 25, 2016 by a vote of 78-0.[5]  Not one California Senator or Assemblymember voted against AB 2594.

52.   The unanimously passed bill was signed into law by Governor Brown on September 23, 2016.[6]  The Bill adds a new section 10561.7 to the Water Code to provide that:

(a) A public entity that captures stormwater from urban areas, in accordance with a stormwater resource plan, before the water reaches a natural channel shall be entitled to use the captured water to the extent that the water augments existing water supplies.

53.   The Bill's legislative history explains, "This bill will make clear that public entities can capture urban stormwater… and use it.  This will encourage more stormwater capture and will provide additional options to finance stormwater systems."[7]  This right to use has long been recognized as a property right under California law. *See, e.g.*, *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), and discussion, *infra*.

///

///

**C. Water Code section 10560, et seq. "The Stormwater Resource Planning Act"**

54.   The Water Code confers on the District and the County a right to use stormwater.   Due to ever-increasing population demands, historically

---

[5] *Id.*
[6] https://www.gov.ca.gov/news.php?id=19559.
[7] 08/23/16- Assembly Floor Analysis, CONCURRENCE IN SENATE AMENDMENTS, Analysis Prepared by: Ryan Ojakian, Dated 08/23/16; https://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml?bill_id=201520160AB2594

significant drought conditions,[8] climate change,[9] and the scarcity of water as a resource in California, stormwater has been recognized as an important resource for public entities in California.

> In the last decade, as prolonged periods of drought restricted water supplies, California's attention to stormwater has shifted to how stormwater could become a water resource *opportunity*. Cities faced substantial costs for stormwater treatment plants. They started developing plans for 'stormwater capture' projects to take advantage of the potential for water supply….[10]

55. Prior to AB 2594, the California State Legislature developed, passed, and amended The Stormwater Resource Planning Act, addressing stormwater as a resource and conferring use or usufructuary rights on the County and District.[11] The Act authorizes the County and District to develop a stormwater resource plan, including compliance with stormwater regulations and beneficial capture of stormwater.[12] The Legislature's findings include the following:[13]

> (b) Improved management of stormwater and dry weather runoff, including capture, treatment, and reuse by using the natural function of

---

[8] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[9] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act,"  "(d) Historical patterns of precipitation are predicted to change and an increasing amount of California's water is predicted to fall not as snow in the mountains, but as rain in other areas of the state.  This will likely have a profound and transforming effect on California's hydrologic cycle and much of that water will no longer by captured by California's reservoirs, many of which are located to capture snow melt."

[10] Stormwater and Green Infrastructure:  The Next Generation of Los Angeles Stormwater Infrastructure, Alf W. Brandt, Office of State Assemblymember Anthony Rendon, Sacramento, California, American Bar Association, Section of Environment, Energy, and Resources, 23rd Section Fall Meeting, Chicago, Illinois, October 28-31, 2015.

[11] California Water Code section 10560, et seq., "The Stormwater Resource Planning Act"

[12] California Senate Bill (Pavley), Chap. 620 of 2009 Statutes.

[13] Water Code section 10561.

soils and plants, can improve water quality, reduce localized flooding, and increase water supplies for beneficial uses and the environment.

(e) When properly designed and managed, the capture and use of stormwater and dry weather runoff can contribute significantly to local water supplies through onsite storage and use, or letting it infiltrate into the ground to recharge groundwater, either onsite or at regional facilities, thereby increasing supplies of drinking water.

(g) Stormwater and dry weather runoff can be managed to achieve environmental and societal benefits such as wetland creation and restoration, riverside habitats, instream flows, and an increase in park and recreation lands, and urban green space.

(h) Stormwater and dry weather runoff management through multiobjective projects can achieve additional benefits, including augmenting recreation opportunities for communities, increased tree canopy, reduced urban heat island effect, and improved air quality.

(j) The capture and use of stormwater and dry weather runoff is not only one of the most cost-effective sources of new water supplies, it is a supply that can often be provided using significantly less energy than other sources of new water supplies. *Id.*

56.   Section 10562 confers usufructuary rights upon the County and District regarding two sources of water—dry weather runoff and stormwater, defined as follows:[14]

(a) 'Dry weather runoff' means surface waterflow and waterflow in storm drains, flood control channels, or other means of runoff conveyance produced by nonstormwater resulting from irrigation, residential, commercial, and industrial activities.

(b) 'Stormwater' means temporary surface water runoff and drainage generated by immediately preceding storms.

57.   The County and District have adopted plans for beneficial uses of stormwater and dry weather runoff ("Water Plans"), including but not limited to the WMPs and EWMPs and plans developed pursuant to the Integrated Regional Water Management Planning Act, intended to capture stormwater for beneficial uses, conserve water resources, and/or improve water quality.

---

[14] CA Water Code section 10561.5.

58. The Water Plans meet the requirements of Water Code section 10562(b), including the following:

(1) Be developed on a watershed basis.

(2) Identify and prioritize stormwater and dry weather runoff capture projects for implementation in a quantitative manner, using a metrics-based and integrated evaluation and analysis of multiple benefits to maximize water supply, water quality, flood management, environmental, and other community benefits within the watershed.

(3) Provide for multiple benefit project design to maximize water supply, water quality, and environmental and other community benefits.

(4) Provide for community participation in plan development and implementation.

(5) Be consistent with, and assist in, compliance with total maximum daily load (TMDL) implementation plans and applicable national pollutant discharge elimination system (NPDES) permits.

(6) Be consistent with all applicable waste discharge permits.

(7) Upon development, be submitted to any applicable integrated regional water management group. Upon receipt, the integrated regional water management group shall incorporate the stormwater resource plan into its integrated regional water management plan.

(8) Prioritize the use of lands or easements in public ownership for stormwater and dry weather runoff projects.

59. The California Legislature does not require that public entities specifically call the plan, the development of the plan, or the component parts of the plan a "Stormwater Resource Plan," recognizing that public entities engage in stormwater resource management in a multitude of ways.[15]   Moreover, the Legislature does not require that the plan be constituted in any one singular plan at any one time, but rather the Legislature acknowledges that public entities will be *developing* and constantly improving their plans, whose components parts may be found in multiple other plans.[16]   The plan may be a proposed plan.[17]

---

[15] Water Code section 10562(c).
[16] Water Code section 10562(c).
[17] *Id.*

HOA.102543427.1

17

60.     Water Code section 10562(c) states,

The proposed or adopted plan shall meet the standards outlined in this section.  The plan need not be referred to as a "stormwater resource plan." Existing planning documents may be utilized as a functionally equivalent plan, including but not limited to, watershed managements plans, integrated resource plans, urban water management plans, or similar plans. If a planning document does not meet the standards of this section, a collection of local and regional plans may constitute a functional equivalent, if the plans collectively meet all of the requirements of this part.

61.     The Water Plans meet the requirements of Water Code section 10562(d), which states, "An entity developing a stormwater resource plan shall identify in the plan all of the following:

(1) Opportunities to augment local water supply through groundwater recharge or storage for beneficial use of stormwater and dry weather runoff.

(2) Opportunities for source control for both pollution and stormwater and dry weather runoff volume, onsite and local infiltration, and use of stormwater and dry weather runoff.

(3) Projects to reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.

(4) Opportunities to develop, restore, or enhance habitat and open space through stormwater and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.

(5) Opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, schoolsites, and government office buildings and complexes, to capture, clean, store, and use stormwater and dry weather runoff rather onsite or offsite.

(6) Design criteria and best management practices to prevent stormwater and dry weather runoff pollution and increase effective stormwater and dry weather runoff management for new and upgraded infrastructure and residential, commercial, industrial, and public development.  These design criteria and best management practices shall accomplish all of the following:

(A) Reduce effective impermeability within a watershed by creating permeable surfaces and directing stormwater and dry weather runoff to permeable surfaces, retention basins, cisterns, and other storage for beneficial use.

(B) Increase water storage for beneficial use through a variety of onsite storage techniques.

(C) Increase groundwater supplies through infiltration, where appropriate and feasible.

(D) Support low-impact development for new and upgraded infrastructure and development using low-impact techniques.

(7) Activities that generate or contribute to the pollution of stormwater or dry weather runoff, or that impair the effective beneficial use of stormwater or dry weather runoff.

(8) Projects and programs to ensure the effective implementation of the stormwater resource plan pursuant to this part and achieve multiple benefits. These projects and programs shall include the development of appropriate decision support tools and the data necessary to use the decision support tools.

(9) Ordinances or other mechanisms necessary to ensure the effective implementation of the stormwater resource plan pursuant to this part.

**D. California Water Rights Law**

**a. The State Does Not "Own" the Water in the Traditional Meaning**

62. The State of California does not "own" water in the traditional meaning of the word. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "In California, the groundwater is not owned by any individual or governmental entity but rather by 'the people of the State' for which the 'State as an entity is the holder of the legal title as trustee for the benefit of the people of the state.'" *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.,* 457 F.Supp.2d 455, 460 (2006) (footnote omitted).[18]

---

[18] The *People* of the State make water policy and control water usage. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1030. "But the State's power under the Water Code is the power to control and regulate use; such a power is distinct from the concept of 'ownership' as used in the Civil Code and in common usage." *Id.* "'Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use.'" *Siskiyou County Farm Bureau v. Department of Fish and Wildlife*, 237 Cal.App.4th 411, 423 (2015). Thus it is not true that "the State has an ownership interest in the 'corpus' of State waters even though individual users have usufructuary rights." Users that have such a right include the County and District. Its interest is correctly viewed as a relative use right fulfilling State Constitutional policy, Water Code section 10560, et seq., and AB 2594 regarding beneficial uses of water.

### b. Beneficial Use Rights

63. The County and District have *beneficial use rights* in the water. *State of California v. Superior Court* (2000) 78 Cal.App.4th 1019, 1024. ("[M]odern water law focuses on the concept of water *rights* rather than water *ownership*. (quoting 1 Waters and Water Rights (1991 ed.) § 4.01, p. 65.)).

64. When the County and District capture stormwater and dry weather runoff, they "salvage" or "rescue" the water, and as rescuers have a prior right to it. *County and District of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 304. The County's and District's rescued or developed waters "are essentially new waters," and the right to use and distribute them belongs to the rescuers. *Pomona Land & Water Co. v. San Antonio Water Co.* (1908) 152 Cal. 618, 623.

### E. Usufructuary Rights/Interests Create a Property Interest

65. The County and District have a usufructuary right and property interest in stormwater and dry weather runoff by their beneficial capture and use of stormwater. *Fullerton v. State Water Resources Control Board*, 90 Cal.App.3d 590, 597 (1979).

66. The County and District built and manage an entire stormwater drainage system, including plans and programs designed and intended to capture stormwater for beneficial uses outlined in The Stormwater Resources Planning Act, discussed further below.

67. The County and District's beneficial capture and use is in line with *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 457 F.Supp.2d 455, 460 (2006), wherein the court explains that usufructuary interests are property interests in California. "[A] usufructuary interest may be acquired and this interest will be deemed to be a 'possessory property right.' [footnote omitted]."

### F. Property Interests Establish Legal Standing

COMPLAINT FOR DAMAGES

68.     The County and District have a usufructuary right and need not "own" the stormwater and dry weather runoff in order to have standing to bring this suit. The County and District's usufructuary interest establishes legal standing.[19]

## G. Beneficial Uses of Stormwater as a Resource

69.     The Water Plans identify various stormwater capture and reuse projects, including but not limited to the Ladera Park Stormwater Enhancement Project and the Gates Canyon Stormwater Capture Project. Other dammed reservoirs, such as Puddingstone Reservoir and Peck Park Lake, mentioned above, capture stormwater and dry weather runoff for beneficial uses including recreation and groundwater recharge.

70.     The stormwater capture and reuse projects generally include the retention of stormwater and non-stormwater, treatment of the water to meet water quality standards established by the County's Department of Public Health, and reuse of the water for irrigation or other onsite uses to augment existing water supplies:

---

[19] *Orange County Water Dist. v. Arnold Engineering Co.*, 196 Cal.App.4th 1110, 1125-1126, footnote 5 of *Orange County Water Dist.* reads, "'[T]he right of property in water is usufructuary, and consists not so much of the fluid itself as the advantage of its use.' [Citation.]  Hence, the cases do not speak of the ownership of water, but only of the right to its use. (*National Audubon Society v. Superior Court* (1983) 33 Cal.3d 419, 441, 189 Cal.Rptr. 346, 658 P.2d 709.)" *Id.* at 1127; in *Selma Pressure Treating Company, Inc. v. Osmose Wood Preserving Company of American, Inc., et al.*, 221 Cal.App.3d 1601 (1990), the court explains a usufructuary interest establishes a property interest, and thus legal standing, for public entities in public nuisance cases; in *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 676 F.Supp.2d 139, 146, fn. 40 (S.D.N.Y. 2009), the court explains "[b]ecause OCWD has a 'possessory property right, that it alleges has been damaged by defendants' conduct, neither its negligence nor products liability claims are barred for lack of a cognizable interest." *Id.* at 461. "OCWD has established a valid usufructuary interest which is independent of the State or the People's general interest in groundwater. [footnote omitted]  Accordingly, OCWD may seek damages on its public nuisance claim to the extent that the alleged nuisance has interfered with that right." *Id.* at 466.

a. The District provides flood protection and water supply services for over 10 million people. Thousands of residents have access to new recreation opportunities at Flood Control District facilities within one mile of their homes.

b. DPW, on behalf of the District, and in partnership with USACE, operates a network of dams and major waterways throughout the Los Angeles Area, referred to at the Los Angeles County Drainage Area. DPW, on behalf of the District, and in partnership with USACE, operates a network of dams and major waterways throughout Los Angeles County, provides flood risk management and water conservation to approximately 10 million people and 2.1 million parcels valued at over $1 trillion.

71. The Water Plans satisfy the elements of a Stormwater Resources Plan (SWRP) in accordance with section 10560, et seq.

The Water Plans support the County's and the District's use rights in stormwater because the component parts meet the requirements of the Stormwater Resources Planning Act and AB 2594.

72. First, the Water Plans are developed on a watershed or sub-watershed basis.[20] This is self-evident based on the Watershed Management Plans (WMPs), Watershed Management Groups (WMGs) and their corresponding Enhanced Watershed Management Programs (EWMPs).

/ / /

---

[20] Water Code section 10562(b)(1).



COMPLAINT FOR DAMAGES

73.     Second, the Water Plans identify activities that generate or contribute to the pollution of storm water or dry whether runoff, or that impair the effective beneficial uses of storm water or dry weather runoff.[21]

74.     Third, the Water Plans are consistent with and assist in compliance with total maximum daily load implementation plans and applicable national pollutant discharge elimination system permits.[22]

75.     Fourth, the Water Plans identify applicable permits and describe how their actions meet applicable waste discharge permit requirements.[23]

76.     Fifth, the County and the District consult with local agencies and governmental organizations in planning and development.[24]

77.     Sixth, the Water Plans provide for community participation in planning and development.[25]

78.     Seventh, the Water Plans use an integrated metrics-based analysis to demonstrate that the Plan's proposed storm water and dry weather capture projects and programs will satisfy identified water management objectives and multiple benefits.[26]

79.     Eighth, the Water Plans identify opportunities to augment local water supply through groundwater recharge or storage for beneficial use of storm water and dry weather runoff.[27]

80.     Ninth, the Water Plans identify opportunities for source control for both pollution and dry weather runoff volume, onsite and local infiltration, and use of storm water and dry weather runoff.[28]

---

[21] Water Code section 10562(d)(7).
[22] Water Code section 10562(b)(5).
[23] Water Code section 10562(b)(6).
[24] Water Code section 10565(a).
[25] Water Code section 10562(b)(4).
[26] Water Code section 10562(b)(2) and (3).
[27] Water Code section 10562(d)(1).
[28] Water Code section 10562(d)(2).

COMPLAINT FOR DAMAGES

81.    Tenth, the Water Plans identify projects that reestablish natural water drainage treatment and infiltration systems, or mimic natural system functions to the maximum extent feasible.[29]

82.    Eleventh, the Water Plans identify opportunities to develop, restore, or enhance, habitat and open space through storm water and dry weather runoff management, including wetlands, riverside habitats, parkways, and parks.[30]

83.    Twelfth, the Water Plans identify opportunities to use existing publicly owned lands and easements, including, but not limited to, parks, public open space, community gardens, farm and agricultural preserves, school sites, and government office buildings and complexes, to capture, clean, store, and use storm water and dry weather runoff either onsite or offsite.[31]

84.    Thirteenth, the Water Plans identify design criteria and best management practices to prevent storm water and dry weather runoff pollution and increase effective storm water and dry weather runoff management for new and upgraded infrastructure and residential, commercial, industrial, and public development.[32]

85.    Fourteenth, the Water Plans use appropriate quantitative methods for prioritization of projects, including metrics-based and integrated evaluation and analysis of multiple benefits to maximize water supply, water quality, flood management, environmental, and other community benefits within the watershed.[33]

/ / /

/ / /

---

[29] Water Code section 10562(d)(3).
[30] Water Code section 10562(d)(4).
[31] Water Code sections 10562(d)(5) and 10562(b)(8).
[32] Water Code section 10562(d)(6).
[33] Water Code section 10562(b)(2).

COMPLAINT FOR DAMAGES

86.     Fifteenth, the County and the District plan projects and programs to ensure the effective implementation of the storm water resource plan that achieve multiple benefits.[34]

## H. SB 859 Public Trust Lands and Public Nuisance

87.     Both houses of the California Legislature passed SB 859 on August 31, 2016.[35] On September 14, 2016, Governor Brown signed SB 859 into law.[36]

88.     SB 859 expressly confirms and codifies the right of public lands trustees to bring civil actions, including public nuisance actions, to preserve and protect those public lands.[37]

89.     SB 859 states in pertinent part,

> "SEC. 11. Section 6009.1 of the Public Resources Code is amended to read:
> 6009.1. The Legislature finds and declares all of the following:
> (b) [A] grantee of public trust lands, including tidelands and submerged lands, acts as a trustee, with the granted tidelands and submerged lands as the corpus of the trust."
> (c) A grantee may fulfill its fiduciary duties as trustee by determining the application of each of the following duties, all of which are applicable under common trust principles:
> (11) The duty to take reasonable steps to enforce claims that are part of the trust property.
> (e) Notwithstanding any other law, and in addition to any other rights and capacities of a trustee to act under law, a trustee of public trust lands shall have the right to bring any action related to its granted public trust lands, including an action to abate a public nuisance, as a representative of the beneficiaries."

90.     The County is a trustee of and hold in trust certain public lands, waters, and submerged and submersible lands, which are impaired due to Monsanto's PCBs.

///

## I. County and District Owned Properties

---

[34] Water Code section 10562(d)(8).

[35] http://leginfo.legislature.ca.gov/faces/billVotesClient.xhtml?bill_id=201520160SB859. At the time of this filing, SB 859 awaits the signature of Governor Brown.

[36] https://www.gov.ca.gov/news.php?id=19537

[37] http://leginfo.legislature.ca.gov/faces/billTextClient.xhtml?bill_id=201520160SB859.

91. The County and District also own properties and submerged lands contaminated with Monsanto's PCBs.  As one such example, the County owns Marina Del Rey, which provides invaluable public recreational opportunities.

92. Marina Del Rey is an 804-acre site (403 water, 401 land), 2,340 feet of off-shore breakwater, 2 miles of main channel (1,000 feet wide), 6.7 miles of side basins (600 feet wide), 7.5 miles of concrete bulkhead, and 6 miles of landscaped roadways.



93. In addition to Marina Del Rey, the County owns Magic Johnson Park Lake, the use of which is impaired due to PCBs. At Magic Johnson Park, fish caught in the lake were determined to have elevated levels of PCBs in fish tissue samples and as a result, a public health advisory was issued for residents not to consume the fish caught in the lake.

94. Similarly, the District owns at least two recreational water bodies – Puddingstone Reservoir and Peck Park Lake – which are also contaminated with PCBs.  The fish caught in both of these water bodies were determined to have elevated levels of PCB in fish tissue samples and as a result, a public health advisory was issued for residents not to consume the fish caught in the lake and reservoir

/ / /

**V.    FACTUAL ALLEGATIONS**

**A. PCBs are Toxic Chemicals that Cause Environmental Contamination.**

95.   Polychlorinated biphenyls, or "PCBs," are molecules comprised of chlorine atoms attached to a double carbon-hydrogen ring (a "biphenyl" ring).  A "PCB congener" is any single, unique chemical compound in the PCB category.  Over two hundred congeners have been identified.[38]

96.   PCBs were generally manufactured as mixtures of congeners.  From approximately 1935 to 1979, Monsanto Company was the only manufacturer in the United States that intentionally produced PCBs for commercial use.[39]  The most common trade name for PCBs in the United States was "Aroclor," which was trademarked by Old Monsanto.

97.   Monsanto's commercially-produced PCBs were used in a wide range of industrial applications in the United States including electrical equipment such as transformers, motor start capacitors, and lighting ballasts.  In addition, PCBs were incorporated into a variety of products such as caulks, paints, and sealants.

98.   As used in this Complaint, the terms "PCB," "PCBs," "PCB-containing products," and "PCB products" refer to products containing polychlorinated biphenyl congener(s) manufactured for placement into trade or commerce, including any product that forms a component part of or that is subsequently incorporated into another product.

99.   PCBs easily migrate out of their original source material or enclosure and contaminate nearby surfaces, air, water, soil, and other materials.  For example, PCB compounds volatilize out of building materials (such as caulk) into

---

[38] Table of PCB Congeners, available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/congeners.htm (last accessed February 20, 2014).

[39] *See* 116 Cong. Record 11695, 91st Congress, (April 14, 1970) ("Insofar as the Monsanto Co., the sole manufacturer of PCB's is concerned . . . ."); 121 Cong. Record 33879, 94th Congress, (October 23, 1975) ("The sole U.S. producer, Monsanto Co. . . . ."). *See also* MONS 058730-058752 at 058733 (identifying other producers as "all ex-USA.").

surrounding materials such as masonry, wood, drywall, and soil, thereby causing damage to those surrounding materials. PCBs can also escape from totally-enclosed materials (such as light ballasts) and similarly contaminate and damage surrounding materials.

100. PCBs present serious risks to the health of humans, wildlife, and the environment.

101. Humans may be exposed to PCBs through ingestion, inhalation, and dermal contact. Individuals may inhale PCBs that are emitted into the air. They may also ingest PCBs that are emitted into air and settle onto surfaces that come into contact with food or drinks. And they may absorb PCBs from physical contact with PCBs or PCB-containing materials.

102. The EPA has determined that Monsanto's PCBs are probable human carcinogens. In 1996, EPA reassessed PCB carcinogenicity, based on data related to Aroclors 1016, 1242, 1254, and 1260. [40] The EPA's cancer reassessment was peer reviewed by 15 experts on PCBs, including scientists from government, academia and industry, all of whom agreed that PCBs are probable human carcinogens.

103. In addition, the EPA concluded that PCBs are associated with serious non-cancer health effects. From extensive studies of animals and primates using environmentally relevant doses, EPA has found evidence that PCBs exert significant toxic effects, including effects on the immune system, the reproductive system, the nervous system, and the endocrine system.

104. PCBs affect the immune system by causing a significant decrease in the size of the thymus gland, lowered immune response, and decreased resistance to

---

[40] EPA, PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures, EPA/600/P-96/001F (September 1996), available at http://www.epa.gov/epawaste/hazard/tsd/pcbs/pubs/pcb.pdf (last accessed May 5, 2014).

HOA.102543427.1

29

viruses and other infections.  The animal studies were not able to identify a level of PCB exposure that did not affect the immune system.  Human studies confirmed immune system suppression.

105.    Studies of reproductive effects in human populations exposed to PCBs show decreased birth weight and a significant decrease in gestational age with increasing exposures to PCBs.  Animal studies have shown that PCB exposures reduce birth weight, conception rates, live birth rates, and reduced sperm counts.

106.    Human and animal studies confirm that PCB exposure causes persistent and significant deficits in neurological development, affecting visual recognition, short-term memory, and learning. Some of these studies were conducted using the types of PCBs most commonly found in human breast milk.

107.    PCBs may also disrupt the normal function of the endocrine system.  PCBs have been shown to affect thyroid hormone levels in both animals and humans.  In animals, decreased thyroid hormone levels have resulted in developmental deficits, including deficits in hearing.  PCB exposures have also been associated with changes in thyroid hormone levels in infants in studies conducted in the Netherlands and Japan.

108.    PCBs have been associated with other health effects including elevated blood pressure, serum triglyceride, and serum cholesterol in humans; dermal and ocular effects in monkeys and humans; and liver toxicity in rodents.

109.    Children may be affected to a greater extent than adults.  The Agency for Toxic Substances and Disease Registry explained:   "Younger children may be particularly vulnerable to PCBs because, compared to adults, they are growing more rapidly and generally have lower and distinct profiles of biotransformation

COMPLAINT FOR DAMAGES

enzymes, as well as much smaller fat deposits for sequestering the lipophilic PCBs."[41]

110.  PCBs are known to be toxic to a number of aquatic species and wildlife including fish, marine mammals, reptiles, amphibians, and birds.  Exposure is associated with death, compromised immune system function, adverse effects on reproduction, development, and endocrine function.  PCB exposure affects liver function, the digestive system, and nervous systems and can promote cancer in a number of animal species.  The presence of PCBs can cause changes in community and ecosystem structure and function.[42]

**B. Monsanto Has Long Known of PCBs' Toxicity.**

111.  Monsanto was well aware of scientific literature published in the 1930s that established that inhalation in industrial settings resulted in toxic systemic effects. [43]

112.  An October 11, 1937, Monsanto memorandum advises that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects.  Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption."[44]

113.  A September 20, 1955, memo from Monsanto employee Emmet Kelly set out Monsanto's position with respect to PCB toxicity: "We know Aroclors are toxic but the actual limit has not been precisely defined.  It does not make too much difference, it seems to me, because our main worry is what will happen if an

---

[41] Agency for Toxic Substances and Disease Registry, Toxicological Profile for Polychlorinated Biphenyls (PCBs), (November 2000), at 405, available at www.atsdr.cdc.gov (last accessed May 1, 2014).
[42] *See* EPA, Understanding PCB Risks, available at http://www.epa.gov/housatonic/understandingpcbrisks.html#WildlifeEcologicalRiskAssessment (last accessed March 5, 2015).
[43] *See* MONS 061332, MONS 095196-7, JDGFOX00000037-63.
[44] MONS 061332.

individual develops [*sic*] any type of liver disease and gives a history of Aroclor exposure.   I am sure the juries would not pay a great deal of attention to [maximum allowable concentrates]."[45]

114.   On November 14, 1955, Monsanto's Medical Department provided an opinion that workers should not be allowed to eat lunch in the Aroclor department:

> It has long been the opinion of the Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties.   While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation.[46]

115.   On January 21, 1957, Emmet Kelly reported that after conducting its own tests, the U.S. Navy decided against using Monsanto's Aroclors:  "No matter how we discussed the situation, it was impossible to change their thinking that Pydraul 150 is just too toxic for use in a submarine."[47]

116.   In 1966, Kelly reviewed a presentation by Swedish researcher Soren Jensen, who stated that PCBs "appeared to be the most injurious chlorinated compounds of all tested."[48]   Jensen refers to a 1939 study associating PCBs with the deaths of three young workers and concluding that "pregnant women and persons who have at any time had any liver disease are particularly susceptible."[49]   Kelly does not dispute any of Jensen's remarks, noting only, "As far as the section on toxicology is concerned, it is true that chloracne and liver trouble can result from large doses."[50]

---

[45] MONS 095196-7.
[46] Monsanto Chemical Company, Memorandum to H.B. Patrick, November 14, 1955 (no Bates number).
[47] MONS 095640.
[48] *See* JDGFOX00000037-63.
[49] *Id*. at JDGFOX00000039.
[50] *Id*. at JDGFOX00000037.

32

COMPLAINT FOR DAMAGES

**C. Monsanto Has Long Known that PCBs Were "Global Contaminants" Causing Harm to Animals and Fish.**

117. In the same general time frame, Monsanto became aware that PCBs were causing widespread contamination of the environment, far beyond the areas of its use.[51]

118. Monsanto's Medical Director reviewed an article by Swedish researcher Soren Jensen, who reported the detection of PCBs in the tissues of fish and wildlife in Sweden.[52] The report noted that PCBs were also detected in the air over London and Hamburg and found in seals caught off the coast of Scotland. Jensen concluded that PCBs can "be presumed to be widespread throughout the world."[53]

119. A December 1968 article by Richard Risebrough identified chlorinated hydrocarbons (which include PCBs) as "the most abundant synthetic pollutants present in the global environment."[54] The article reported finding significant concentrations of PCBs in the bodies and eggs of peregrine falcons and 34 other bird species. The report linked PCBs to the rapid decline in peregrine falcon populations in the United States.

120. Despite growing evidence of PCBs' infiltration of every level of the global ecology, Monsanto remained steadfast in its production of Aroclors and other PCBs.

121. On March 6, 1969, Monsanto employee W. M. Richard wrote a memorandum discussing Risebrough's article that criticized PCBs as a "toxic substance",

---

[51] See MONSFOX00003427; MONS 030483-030486; R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).
[52] New Scientist (December 15, 1986), MONSFOX00003427.
[53] *Id.*
[54] R.W. Risebrough, Polychlorinated Biphenls in the Global Ecosystem, Nature, Vol. 220 (December 14, 1968).

33

"widely spread by air-water; therefore, an uncontrollable pollutant . . . causing extinction of peregrine falcon … [and] endangering man himself."[55]  Richard explained that Monsanto could take steps to reduce PCB releases from its own plants but cautioned, "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper.  In this applications exposure to consumers is greater and the disposal problem becomes complex."[56]

122.    On September 9, 1969, Monsanto employee W.R. Richard wrote an interoffice memo titled "Defense of Aroclor."[57]  He acknowledged the role of Aroclor in water pollution: "Aroclor product is refractive, will settle out on solids – sewerage sludge – river bottoms, and apparently has a long life."  He noted that Aroclors 1254 and 1260 had been found along the Gulf Coast of Florida causing a problem with shrimp; in San Francisco Bay, where it was reported to thin egg shells in birds; and in the Great Lakes.  Richard advised that the company could not defend itself against all criticism: "We can't defend vs. everything.  Some animals or fish or insects will be harmed.  Aroclor degradation rate will be slow.  Tough to defend against.  Higher chlorination compounds will be worse [than] lower chlorine compounds.  Therefore we will have to restrict uses and clean-up as much as we can, starting immediately."[58]

123.    On January 29, 1970, Elmer Wheeler of the Medical Department circulated laboratory reports discussing results of animal studies.  He noted: "Our interpretation is that the PCB's are exhibiting a greater degree of toxicity in this chronic study than we had anticipated.  Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals."[59]

---

[55] MONS 096509-096511.
[56] Id.
[57] DSW 014256-014263.
[58] Id.
[59] MONS 098480.

124.   Monsanto expressed a desire to keep profiting from PCBs despite the environmental havoc in a PCB Presentation to Corporate Development Committee.  The report suggests possible reactions to the contamination issue. It considered that doing nothing was "unacceptable from a legal, moral, and customer public relations and company policy viewpoint."  But the option of going out of the Aroclor business was also considered unacceptable: "there is too much customer/market need and selfishly too much Monsanto profit to go out."[60]

125.   The Aroclor Ad Hoc Committee at Monsanto held its first meeting on September 5, 1969.  The committee's objectives were to continue sales and profits of Aroclors in light of the fact that PCB "may be a global contaminant."[61] The meeting minutes acknowledge that PCB has been found in fish, oysters, shrimp, birds, along coastlines of industrialized areas such as Great Britain, Sweden, Rhine River, low countries, Lake Michigan, Pensacola Bay, and in Western wildlife.  Moreover, the committee implicated the normal use of PCB-containing products as the cause of the problem: "In one application alone (highway paints), one million lbs/year are used.  Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment."[62]

126.   A month later, on October 2, 1969, the Committee reported extensive environmental contamination.  The U.S. Department of Interior, Fish and Wildlife found PCB residues in dead eagles and marine birds.  Similarly, the Bureau of Commercial Fisheries reported finding PCBs in the river below Monsanto's Pensacola plant.   The U.S. Food and Drug Administration had discovered PCBs in milk supplies.

---

[60] MONS 058737.
[61] MONS 030483-030486.
[62] MONS 030485.

COMPLAINT FOR DAMAGES

127.    The Committee advised that Monsanto could not protect the environment from Aroclors as "global" contaminants but could protect the continued manufacture and sale of Aroclors (highlight added):[63]

> The committee believes there is little probability ~~(---)~~ that any action that can be taken will prevent the growing incrimination of specific polychlorinated biphenyls (the higher chlorinated--e.g. Aroclors 1254 and 1260) as nearly global environmental contaminants leading to contamination of human food (particularly fish), the killing of some marine species (shrimp), and the possible extinction of several species of fish eating birds.
>
> Secondly, the committee believes that there is no ~~possi-ble~~ *practical* course of action that can so effectively police the uses of these products as to prevent environmental con- *in order* tamination. *completely some*
>
> There are, however, a number of ~~possible~~ actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series. *(Less than 5 chlorines)*

128.    Monsanto's desire to protect Aroclor sales rather than the environment is reflected in the Committee's stated objectives:

1. Protect continues sales and profits of Aroclors;
2. Permit continued development of new uses and sales, and
3. Protect the image of the Organic Division and the Corporation as members of the business community recognizing their responsibilities to prevent and/or control contamination of the global ecosystem.[64]

129.    In 1969, Monsanto's internal documents show they knew their products would contaminate the environment with PCBs, and Monsanto understood the foreseeable fate and transport, including "water contamination... for a lengthy period by leaching from the contaminated mud" (highlight added):

---

[63] DSW 014612-014624, at 014615.
[64] *Id.*

HOA.102543427.1

36

For a clearer understanding of the general problem, the situation at Pensacola was reviewed. From a relatively negligible discharge of 1-3 gal/day into a large river, 1/4 mile downstream levels of 42 ppb in water and 476 ppm in mud were found. Although use of Aroclor was halted immediately, we can expect the water contamination to continue for a lengthy period by leaching from the contaminated mud. No downstream samples have yet been taken to measure the decrease in contamination (as of 9/5/69).

130.   Monsanto also knew how PCBs would foreseeably migrate from their PCB-containing products and wind up in the environment, as evidenced by internal Monsanto documents (highlight added):

Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers. In one application alone (highway paints), one million lbs/year are used. Through abrasion and leaching we can assume that nearly all of this Aroclor winds up in the environment.

131.   An interoffice memorandum circulated on February 16, 1970, provided talking points for discussions with customers in response to Monsanto's decision to eliminate Aroclors 1254 and 1260: "We (your customer and Monsanto) are not interested in using a product which may present a problem to our environment." Nevertheless, the memo acknowledges that Monsanto "can't afford to lose one dollar of business." To that end, it says, "We want to avoid any situation where a customer wants to return fluid. . . . We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system.  We don't want to take fluid back." [65]

---

[65] MONS 100123-100124.

HOA.102543427.1

37

COMPLAINT FOR DAMAGES

132.   In 1970, the year after Monsanto formed the Ad Hoc Committee, and despite Monsanto's knowledge of the global reach of PCB contamination, PCB production in the United States peaked at 85 million pounds.

133.   Growing awareness of the ubiquitous nature of PCBs led the United States to conduct an investigation of health and environmental effects and contamination of food and other products.  An interdepartmental task force concluded in May 1972 that PCBs were highly persistent, could bioaccumulate to relatively high levels, and could have serious adverse health effects on human health.[66]

134.   After that report, environmental sampling and studies indicated that PCBs were a "more serious and continuing environmental and health threat than had been originally realized."[67]   To address these concerns, EPA undertook a study to assess PCB levels in the environment on a national basis.  That study revealed widespread occurrence of PCBs in bottom sediments in several states, including California; in fish and birds; in lakes and rivers; in the Atlantic Ocean, the Pacific Ocean, and the Gulf of Mexico; in sewage treatment facilities; in a variety of foods including milk, poultry, eggs, fish, meat, and grains; and in human tissues, blood, hair, and milk.[68]

135.   EPA's study noted the particular burden on California.  "PCBs have become a significant component of the marine food webs of southern California," were found in sediments in the Santa Barbara Basin, and were found in high levels in the San Francisco Bay.[69]

136.   At the same time, Monsanto was promoting the use and sale of Aroclor and other PCB compounds.  In a 1960 brochure, Monsanto promotes the use of Aroclors in transformers and capacitors, utility transmission lines, home

---

[66] EPA, Review of PCB Levels in the Environment, EPA-560/7-76-001 (January 1976).
[67] *Id*. at 1.
[68] *Id*., *passim*.
[69] *Id*.

COMPLAINT FOR DAMAGES

appliances, electric motors, fluorescent light ballasts, wire or cable coatings, impregnants for insulation, dielectric sealants, chemical processing vessels, food cookers, potato chip fryers, drying ovens, thermostats, furnaces, and vacuum diffusion pumps.  Aroclors could also be used, the brochure advertised, as a component of automotive transmission oil; insecticides; natural waxes used in dental casting, aircraft parts, and jewelry; abrasives; specialized lubricants; industrial cutting oils; adhesives; moisture-proof coatings; printing inks; papers; mastics; sealant; caulking compounds; tack coatings; plasticizers; resin; asphalt; paints, varnishes, and lacquers; masonry coatings for swimming pools, stucco homes, and highway paints;  protective and decorative coatings for steel structures, railway tank and gondola cars; wood and metal maritime equipment; and coatings for chemical plants, boats, and highway marking. [70]

137.   A 1961 brochure explains that Monsanto's Aroclors are being used in "lacquers for women's shoes,"  as "a wax for the flame proofing of Christmas trees," as "floor wax," as an adhesive for bookbinding, leather, and shoes,  and as invisible marking ink used to make chenille rugs and spreads. [71]

138.   Thus, by February 1961, at the latest, Monsanto knew that its Aroclors were being used in a variety of industrial, commercial, household, and consumer goods.   Moreover, Monsanto affirmatively encouraged these uses by encouraging salesmen to market products for these and other applications.

///

139.   A few years later, in 1970, Monsanto tried to distance itself from the variety of applications of Aroclors that it proudly espoused a few years before.  In a press release, the company claimed:  " 'What should be emphasized . . . is that PCB was developed over 40 years ago primarily for use as a coolant in electrical

---

[70] The Aroclor Compounds (hand dated May 1960), 0509822- 66.
[71] Plasticizer Patter (February 1961), 0627503-21.

transformers and capacitors.  It is also used in commercial heating and cooling systems.  It is not a 'household' item."[72]

**D. Monsanto Concealed the Nature of PCBs from Governmental Entities.**

140.   While the scientific community and Monsanto knew that PCBs were toxic and becoming a global contaminant, Monsanto repeatedly misrepresented these facts, telling governmental entities the exact opposite — that the compounds were not toxic and that the company would <u>not</u> expect to find PCBs in the environment in a widespread manner.[73]

141.   <u>In a March 24, 1969 letter to Los Angeles County Air Pollution Control District</u>, Monsanto advised that the Aroclor compounds "are not particularly toxic by oral ingestion or skin absorption."[74]  Addressing reports of PCBs found along the West Coast, Monsanto claimed ignorance as to their origin, explaining that "very little [Aroclor] would normally be expected either in the air or in the liquid discharges from a using industry."[75]  A similar letter to the Regional Water Quality Control Board explained that PCBs are associated with "no special health problems" and "no problems associated with the environment."[76]

142.   In May, 1969, Monsanto employee Elmer Wheeler spoke with a representative of the National Air Pollution Control Administration, who promised to relay to Congress the message that Monsanto "cannot conceive how the PCBs can be getting into the environment in a widespread fashion."[77]

143.   Monsanto delivered the same message to the New Jersey Department of Conservation in July, 1969, claiming first, "Based on available data,

---

[72] *See* Press release (July 16, 1970), MCL000647-50 at MCL000648.
[73] *See* notes 42-46, *infra* (letters to governmental agencies).
[74] Letter from Monsanto to Los Angeles County Air Pollution Control District (March 24, 1969).
[75] *Id*.
[76] Letter from Monsanto to State of California Resources Agency (March 27, 1969).
[77] Monsanto Memorandum to W.R. Richard (May 26, 1969).

COMPLAINT FOR DAMAGES

manufacturing and use experience, we do not believe the PCBs to be seriously toxic."[78]  The letter then reiterates Monsanto's position regarding environmental contamination:  "We are unable at this time to conceive of how the PCBs can become wide spread in the environment. It is certain that no applications to our knowledge have been made where the PCBs would be broadcast in the same fashion as the chlorinated hydrocarbon pesticides have been."[79]

**E. Monsanto Instructed Customers to Improperly Dispose of PCBs**

144.    Initially, Monsanto instructed its customers to dispose of PCB containing wastes in local landfills, knowing that landfills were not suitable for PCB-contaminated waste.  Monsanto had determined that the only effective method of disposing of PCBs was high temperature incineration, which was not commercially available to it or its customers, and it had constructed an incinerator for the disposal of its *own liquid* PCB wastes.  However, as Monsanto employee William Papageorge explained in his 1975 testimony before the Wisconsin Department of Natural Resources, Monsanto instructed its customers to dispose of *solid* PCB contaminated wastes in landfills: "lacking that resource [a commercial incinerator], we have to reluctantly suggest, because we don't have a better answer, that they find a well operated, properly operated landfill and dispose of the material in that fashion."[80]

**F. Monsanto's PCBs Create a Continuing Tort**

145.    Monsanto's wrongful conduct has created an environmental problem whereby PCBs continue to emanate out of Monsanto's PCB-containing products, causing new deposits of toxic PCBs in the waterbodies of Los Angeles County,

---

[78] Letter from Monsanto to Department of Conservation and Economic Development (July 23, 1969).
[79] *Id.*
[80] Transcript from Hearing before Wisconsin Department of Natural Resources, 1975.

including those owned by District and the County, creating new, continuous, and ongoing contamination.

146. Monsanto PCBs continue to volatilize, vaporize, leach, and leak from Monsanto's PCB-containing products and their intended applications as described above on a daily basis.  These Monsanto PCB chemicals can enter into the environment, streets, roadways, sidewalks, parks, gutters, storm inlets, and storm drains, and the waterbodies of Los Angeles County, including those owned by District and the County, on a daily basis.

147. New PCBs contaminate District and County water bodies and facilities on a daily basis.

148. Monsanto's PCBs, emanating from Monsanto's PCB-containing products, will continue to contaminate District and County water bodies, storm water, and facilities on a daily basis in the future and for years to come if efforts are not made to reduce, remove, and avoid the presence of Monsanto's PCBs.

## FIRST CAUSE OF ACTION

## PUBLIC NUISANCE

149. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

150. Monsanto manufactured, distributed, marketed, and promoted PCBs in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the free use of the stormwater and waterbodies of Los Angeles County owned by County and District.

/ / /

/ /

151. The presence of PCBs interferes with the comfortable enjoyment of the waterbodies of Los Angeles County for customary uses for fishing, swimming, and other water activities.

COMPLAINT FOR DAMAGES

152.   The presence of PCBs interferes with the free use of the waterbodies of Los Angeles County for the promotion of commerce, navigation, and fisheries.

153.   The presence of PCBs interferes with the free use of the waterbodies of Los Angeles County for ecological preservation and habitat restoration.

154.   The presence of PCBs interferes with the free use of stormwater captured by the County and District for beneficial uses.

155.   The Los Angeles Regional Water Quality Control Board, pursuant to the NPDES under the Clean Water Act, requires the Plaintiffs to reduce their discharge of and monitor PCBs to prevent further contamination of the already impaired bodies of water.

156.   The presence of PCBs causes significant costs, inconvenience and annoyance to Plaintiffs, who are charged with reducing and monitoring PCB discharge toward TMDL levels, in order to protect plant and animal life, and the quality of water in waterbodies in Los Angeles County.

157.   The condition affects a substantial number of people who use Los Angeles County Waters for commercial and recreational purposes and interferes with the rights of the public at large to clean and safe resources and environment.

158.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PCBs that endanger the health of fish, animals, and humans and degrade water quality and destroy marine habitats.

159.   The seriousness of the environmental and human health risk far outweighs any social utility of Monsanto's conduct in manufacturing and selling PCBs and concealing the dangers posed to human health and the environment.

/ / /

/ / /

160.   The Plaintiffs have suffered and will continue to suffer harm that is different from the type of harm suffered by the general public, and the Plaintiffs have incurred substantial costs deriving from state-mandated PCB TMDLs.

161. Plaintiffs did not consent to the conduct that resulted in the contamination of waterbodies of Los Angeles County.

162. Monsanto's conduct was a substantial factor in causing the harm to the Plaintiffs.

163. Monsanto knew or, in the exercise of reasonable care, should have known that the manufacture and sale of PCBs were causing the type of contamination now found in Los Angeles County Waters. Monsanto knew that PCBs would contaminate water supplies, would degrade marine habitats, would kill fish species, and would endanger birds and animals. In addition, Monsanto knew that PCBs are associated with serious illnesses and cancers in humans and that humans may be exposed to PCBs through ingestion and dermal contact. As a result, it was foreseeable to Monsanto that humans may be exposed to PCBs through swimming in contaminated waters or by eating fish from those waters. Monsanto thus knew, or should have known, that PCB contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of any coastal marine areas.

164. As a direct and proximate result of Monsanto's creation of a public nuisance, Plaintiffs have suffered, and continues to suffer, monetary damages to be proven at trial.

165. Monsanto's conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because Monsanto callously decided to increase sales and develop new ways to promote PCBs, knowing PCBs are toxic, cannot be contained, and last for centuries.

/ / /

## **SECOND CAUSE OF ACTION**
## **EQUITABLE INDEMNITY**

COMPLAINT FOR DAMAGES

166.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

167.   Monsanto is responsible for creating the public nuisance by manufacturing, distributing, and promoting PCBs, resulting in contamination in and around water bodies in Los Angeles County.

168.   Monsanto's creation of the public nuisance contributed as a substantial factor in causing Plaintiffs' injuries and damages.

169.   The conduct of Plaintiffs did not contribute in any way to the creation of the public nuisance.

170.   Plaintiffs did not consent to the PCB contamination.

## THIRD CAUSE OF ACTION

## STRICT LIABILITY- DESIGN DEFECT- CONSUMER EXPECTATION TEST

171.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

172.   Plaintiffs were harmed by Aroclors and other PCB-containing products ("Monsanto's PCB Products") which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

173.   The design of Monsanto's PCB products were defective because Monsanto's PCB Products did not perform as safely as an ordinary consumer would have expected them to perform.

174.   Monsanto designed, manufactured, sold, and distributed Monsanto's PCB Products.

/ / /

/ / /

COMPLAINT FOR DAMAGES

175. Monsanto's PCB Products did not perform as safely as an ordinary consumer would have expected it to perform when used or misused in an intended or reasonably foreseeable way.

176. Plaintiffs were, are, and will be harmed by Monsanto's PCB Products.

177. Monsanto's PCB Products failure to perform safely was a substantial factor in causing Plaintiffs' harm.

178. Monsanto had actual knowledge that its PCB Products were causing the type of harm suffered by Plaintiffs.  Monsanto also knew or should have known that these products caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

179. Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

180. Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FOURTH CAUSE OF ACTION

### STRICT LIABILITY- DESIGN DEFECT- RISK-BENEFIT TEST

181. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

182. Plaintiffs were harmed by Aroclor and other PCB-containing products which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

183. The design of Monsanto's PCB products caused harm to Plaintiffs.

184. Plaintiffs were, are, and will be harmed by Monsanto's PCB products.

185. The design of Monsanto's PCB products was a substantial factor in causing harm to Plaintiffs.

186.   The gravity of the huge environmental harm resulting from the use of Monsanto's PCB products was, is, and will be enormous because Monsanto's PCB products created a global contaminant as one of the largest man-made water contaminants in the world.

187.   The likelihood that this harm would occur was, is, and will be very high because Monsanto knew and/or should have known Monsanto's PCB products were toxic, could not be contained, and do not readily degrade in the environment.

188.   In fact, Monsanto foresaw the enormity of the environmental harm but consciously chose to keep producing PCB products.

189.   At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous, including not using PCBs at all in Monsanto's products—PCBs are entirely man-made, manufactured chemicals.

190.   Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

191.   Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## FIFTH CAUSE OF ACTION

## STRICT LIABILITY- FAILURE TO WARN

192.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

193.   Plaintiffs were harmed by Aroclor and other PCB-containing products which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

194.   Monsanto's PCB products lacked sufficient instructions or warning of potential environmental hazard and toxicity.

195.  Monsanto designed, manufactured, sold, and distributed Monsanto's PCB products.

196.  Monsanto's PCB products had potential environmental hazard and toxicity risks that were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Monsanto's superior knowledge about its products at the time of design, manufacture, sale, distribution of Monsanto's PCB products.

197.  The potential environmental hazard and toxicity risks presented a substantial danger when Monsanto's PCB products were and are used or misused in an intended or reasonably foreseeable way.

198.  Ordinary consumers and third-parties would not have recognized the potential risks.

199.  Monsanto failed to adequately warn or instruct of the potential risks.

200.  Plaintiffs were, are, and will be harmed.

201.  The lack of sufficient instructions or warnings was a substantial factor in causing Plaintiffs' harm.

202.  Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

203.  Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

## SIXTH CAUSE OF ACTION

## NEGLIGENCE- MANUFACTURER OR SUPPLIER- DUTY TO WARN

204.  Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

205.  Plaintiffs were harmed by Aroclor and other PCB-containing products which were designed, manufactured, sold, and distributed by Monsanto, and which

were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

206. Monsanto was negligent by not using reasonable care to warn or instruct about Monsanto's PCB products' dangerous condition or about the facts that made Monsanto's PCB products likely to be dangerous.

207. Monsanto designed, manufactured, sold, and distributed Monsanto's PCB products.

208. Monsanto knew or reasonably should have known that Monsanto's PCB products were dangerous or likely to be dangerous when used or misused in a reasonably foreseeable manner.

209. Monsanto knew or reasonably should have known that users and third parties would not realize the danger.

210. Monsanto failed to adequately warn of the danger or instruct on the safe use of the Monsanto's PCB products.

211. A reasonable chemical manufacturer, seller, distributor, under the same or similar circumstances would have warned of the danger or instructed on the safe use of the Monsanto's PCB products.

212. Plaintiffs were, are, and will be harmed.

213. Monsanto's failure to warn or instruct was a substantial factor in causing Plaintiffs' harm.

## SEVENTH CAUSE OF ACTION

## NEGLIGENCE- RECALL

214. Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

215. Plaintiffs were harmed by Aroclor and other PCB-containing products which were designed, manufactured, sold, and distributed by Monsanto, and which were defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

216. Monsanto was negligent because it failed to recall Monsanto's PCB products.

217. Monsanto designed, manufactured, sold, and distributed Monsanto's PCB products.

218. Monsanto knew or reasonably should have known that Monsanto's PCB products were dangerous or likely to be dangerous when used in a reasonably foreseeable manner.

219. Monsanto became aware of this defect soon after Monsanto began selling its Monsanto PCB products and certainly before the time it ceased sales in the late 1970s.

220. Monsanto failed to recall or warn of the danger of Monsanto's PCB products.

221. A reasonable designer, manufacturer, distributor, or seller under the same or similar circumstances would have recalled Monsanto's PCB products.

222. Rather than recall the products, Monsanto actually increased production despite its knowledge of the dangers.

223. Plaintiffs were, are, and will be harmed.

224. Monsanto's failure to recall the product was a substantial factor in causing Plaintiffs' harm.

225. Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

226. Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

/ / /

/ / /

## **EIGHTH CAUSE OF ACTION**

### **TRESPASS**

HOA.102543427.1

COMPLAINT FOR DAMAGES

227.   Plaintiffs reallege and reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

228.   Plaintiffs control stormwater and dry weather run off systems, certain water bodies, thousands of miles of infrastructure, and other property.

229.   Monsanto intentionally, recklessly, and negligently caused its PCBs to enter the stormwater and dry weather run off systems, certain water bodies, thousands of miles of infrastructure, and other property.

230.   Plaintiffs did not give permission for the entry.

231.   Plaintiffs were, are, and will be actually harmed.

232.   Monsanto's conduct was a substantial factor in causing Plaintiffs' harm.

233.   Monsanto's conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Monsanto was grossly negligent.

234.   Monsanto, its officers, directors, and managing agents, engaged in despicable conduct and acted or failed to act with malice, oppression, and fraud, warranting punitive or exemplary damages.

/ / /

/ / /

COMPLAINT FOR DAMAGES

## **PRAYER FOR RELIEF**

Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1. Compensatory damages according to proof;

2. Punitive damages;

3. Litigation costs and attorneys' fees as provided by law;

4. Pre-judgment and post-judgment interest;

5. Any other and further relief as the Court deems just, proper, and equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial.

Dated:  May 29, 2019          by: /s/_____

**OFFICE OF THE COUNTY COUNSEL**
**County of Los Angeles**
Mary Wickham, County Counsel (SBN 145664)
mwickham@counsel.lacounty.gov
Scott Kuhn (SBN 190517)
skuhn@counsel.lacounty.gov
Andrea Ross (SBN 179398)
aross@counsel.lacounty.gov
Tracy Swann (SBN 172899)
tswann@counsel.lacounty.gov
Joseph Mellis (SBN 287830)
jmellis@counsel.lacounty.gov

Dated:  May 29, 2019          by: /s/ John P. Fiske_____

**BARON & BUDD, P.C.**
John P. Fiske (SBN 249256)
fiske@baronbudd.com
Celeste Evangelisti (SBN 225232)
cevangelisti@baronbudd.com

*Attorneys for the Plaintiffs*

COMPLAINT FOR DAMAGES

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT FOR DAMAGES